IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LORI LAWSON,**
**Natural Parent on behalf of**
**K.L.,[1] a minor,**

        **Plaintiff,**           **Civil Action 2:19-cv-2584**
                                    **JUDGE EDMUND A. SARGUS, JR.**
**v.**                                **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Lori Lawson ("Plaintiff"), on behalf of her minor child ("K.L."), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Supplemental Security Income benefits ("SSI").   This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), ("SOE"), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 12).   For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed an application for benefits on behalf of her minor child, K.L., in April 2013, alleging that K.L. has been disabled since January 1, 2012, due to epilepsy, severe migraine and fluids on her spine.   (R. at 159-64, 184.)   K.L.'s application was denied

---

[1] Pursuant to F.R.C.P. 5.2(a)(3), the name of an individual known to be a minor in a filing with the court may only include the minor's initials.

throughout the administrative process, which included a denial by the Appeals Council.   This

Court subsequently remanded the case to the Commissioner on April 10, 2017 pursuant to the

parties' Joint Stipulation.   (R. at 936-39.)   Upon remand by the Appeals Council (R. at 940-43),

Administrative Law Judge Thomas L. Wang ("ALJ") held a subsequent hearing on March 7,

2018, at which Plaintiff, appeared and testified.   (R. at 889-911.)   On March 30, 2018, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security

Act.   (R. at 949–66.)   On May 29, 2019, the Appeals Council denied Plaintiff's request for

review and adopted the ALJ's decision as the Commissioner's final decision.   (R. at 852-57.)

Plaintiff then timely commenced this action.

## II.   HEARING TESTIMONY

At the March 7, 2018 hearing, Lori Lawson, K.L.'s mother testified that her five-year-old

son in kindergarten was more advanced than K.L., who was 8 years old on the date of the

hearing.   (R. at 893.)   K.L. was in first grade, but Ms. Lawson said she should be in third grade.

She had attended special needs preschool twice.   (*Id.*)   According to Ms. Lawson, K.L. is

unable to recognize all the letters of the alphabet.   (R. at 894.)   K.L. can write her first name but

cannot write her last name and doesn't know how to spell her middle name.   (R. at 895.)   Ms.

Lawson affirmed K.L. is not able to add or subtract numbers.   (*Id.*)   For a while, they lived with

Ms. Lawson's father-in-law, at which time K.L. was placed in a different school, but given the

timing, she was not receiving her IEP accommodations.   K.L. had since returned to Wilson

Elementary which is a special needs school.   (R. at 896-97.)   Ms. Lawson testified K.L. rides a

special needs bus with a registered nurse on the bus.   (R. at 897.)   At the time of the hearing,

K.L. was waking up every morning at 4:00 a.m., so her "doctors are doing some studies."   (R. at

899.)   K.L. was experiencing severe migraines three to four times a month.   (R. at 900.)

2

Ms. Lawson testified that K.L.'s medications included Trileptal and Keppra.   (R. at 901.)   Ms. Lawson testified she still dresses K.L. daily, brushes her teeth, and washes and brushes her hair because "it's both of her not wanting to do it, and I think she's not comprehending that."   (R. at 903.)   Ms. Lawson also testified that K.L. is forgetful and has a hard time remembering at all unless she is constantly reminded.   (R. at 903-04.)

### III.     MEDICAL RECORDS

#### A.     Nationwide Children's Hospital

K.L. was seen in the emergency room February 2012 following a seizure.   Her history noted her first seizure occurred on June 11, 2011, at eighteen months of age.   (R. at 325.)   A CT scan of her brain showed dysplasia (increased white matter volume) and borderline Chiari one malformation.   (R. at 326.)   K.L.'s history also showed that after a seizure on September 2011, K.L.'s medication was increased.   (R. at 325.)

At a follow-up appointment a month later, K.L. was reportedly doing well with her increased medication dosage.   (R. at 328.)   In May 2012, K.L. was "doing well," as well as talking more clearly with more words in her sentences.   (R. at 343.)   K.L. had another seizure on June 24, 2012, at which time her seizure medication was again increased.   (R. at 354-56, 368.)

A February 2013 brain CT showed persistent enlargement of the left lateral ventricle and dysplasia in the left hemisphere.   (R. at 593.)   K.L. was seen for follow-up in March 2013, where it was reported that K.L. had "no seizures" and was "talking more clearly" with more words in her sentences.   (R. at 442.)   At that time, her medication was not changed.   (R. at 446.)

K.L. was admitted to the hospital after suffering from a seizure in April 2013.  (R. at 238-301.)  An EEG at that same time showed abnormal slowing of background activity.  The interpreting physician noted the generalized beta seen throughout the recording was likely related to medication effects.  (R. at 602-03.)  An MRI of the brain revealed subtle cortical dysplasia involving left frontal and parietal lobes associated with diminished left cerebral white matter volume and moderately enlarged left ventricles and a Chiari I Malformation and Scaphocephaly.  (R. at 608-09.)

On May 29, 2013, K.L. was seen in consultation at the neurology clinic, for possible surgical candidacy for her epilepsy.  (R. at 452-56.)  K.L.'s parents reported that she was meeting language and motor milestones, and that they had no concerns about her behavior.  The physician suggested recording her seizures on long term video EEG monitoring and a more intensive neuropsychological evaluation was scheduled.  (R. at 455-56.)

On July 22, 2013, when she was 3 years, 5-months-old, K.L. underwent a neuropsychological evaluation with neuropsychology intern, Kelly Wolfe, M.A.  (R. at 474-77.)  Ms. Wolfe noted that K.L.'s interactions with her were generally age-appropriate.  With encouragement and tangible rewards (stickers,) K.L. approached testing cooperatively, and was motivated to perform well.  As testing progressed, K.L. had difficulty maintaining her attention and needed several breaks.  K.L. tested in the low average range in the execution of verbal skills and her motor functioning was below average with each hand.  She inconsistently identified colors and some concepts based on size and similarity/dissimilarity and could not identify letter, numbers or basic shapes.  Ms. Wolfe found K.L. had low-average cognitive ability, low-average verbal skills, below-average fine motor skills, and low-average pre-academic skills such as identifying colors and concepts.  K.L.'s speech was normal.  I.Q. testing revealed a full score

4

I.Q. of 81, Verbal of 92, and Visual/Spatial of 80.   (R. at 475.)   Ms. Wolfe noted that K.L.'s neuropsychological deficits may place her at risk for future difficulties in school but that she had "the cognitive abilities needed to benefit from formal instruction."   (R. at 476.)   Ms. Wolfe did note that the results of this evaluation "should be interpreted cautiously," due to limited testing based on K.L.'s young age and her "left-handedness and family history of left-handedness makes it difficult to generate conclusions about lateralization of specific cognitive functions."   (*Id.*) Her weakness in working memory may make it difficult for her to remember and follow instructions, particularly in a busy classroom environment and her fine motor weaknesses may make it difficult for her to acquire handwriting skills.   Ms. Wolfe believed that K.L. may be at risk for psychological distress in the future and should be closely monitored.   (*Id.*)   Ms. Wolfe suggested a special education preschool and felt she would benefit from an occupational therapy evaluation.   (R. at 477.)

K.L. was found to be seizure-free during her appointments in October 2013 (R. at 489), February 2014 (R. at 582), and in April 2014.   (R. at 587.)

By October 9, 2014, when seen in follow up, it was noted that K.L. had been seizure-free for one and a half years, since Trileptal was added to her medication regimen.   (R. at 818.)   The neurologist assessed a speech delay and cognitive disorder.   (R. at 820.)

On April 1, 2015, K.L. underwent another EEG due to K.L.'s waking up in the night with headaches and staring spells.   The EEG was found to be abnormal for age and level of consciousness showing infrequent sharp waves left frontal and right posterior temporal areas with no definite seizure noted.   (R. at 1165.)   K.L.'s seizure medication was reduced in May 2015.   (R. at 1168)   However, following seizures in November 2015 and January 2016, Keppra was re-initiated.   (R. at 1172, 1419–1420, 1425.)

In March 2016, when K.L. was 6 years old she underwent a neuropsychological evaluation to update recommendations for clinical management.   (R. at 1514-22.)   The examiners found that K.L.'s cognitive skills were overall below average, though her IQ test was uninterpretable.   K.L. exhibited poor performance on measures of visuo-motor construction skills; fine motor speed; basic academics relative to others her age; attention; and processing speed.  (R. at 1517.)   K.L. had intact verbal and memory skills, though below average nonverbal skills, visual perception, abstract reasoning.   (R. at 1516.)   K.L.'s attention and activity levels were "within expectation for age."   (R. at 1515.)   The examiners believed that K.L.'s history of epilepsy was likely contributing to her difficulties with mood, behavior, and learning; intrauterine exposure to tobacco and oxycodone may have also affected neurological development (R. at 1517-18.)   The examiners determined that K.L. would likely need to continue special educational services in kindergarten.   (R. at 1518.)   The examiners recommended specialized instruction in reading, math and writing, including a resource room; visual information being supplemented with verbal or language-based explanation; more repetition and review of unfamiliar information; and occupational therapy evaluation.   (R. at 1518-19.)

In November 2016, K.L. consulted with a pediatric epileptologist, who noted that K.L. had been "doing well" for the past year, and that she should continue antiepileptic medication. (R. at 1697-1702.)

### B.      State agency review

Twice in 2013, K.L.'s childhood disability claim and medical records were reviewed, analyzed, and her limitations evaluated in each of the six functional domains.   (R. at 80-87, 89-98.)   In June, pediatrician, Janice Taylor, M.D. determined that K.L.'s impairments did not

meet, medically equal, or functionally equal any listed childhood impairment.  (R. at 83.)  She concluded that the medical record demonstrated had no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulation of objects, and caring for herself.  (R. at 83–85.)  Due to her ongoing seizures, Dr. Taylor opined that K.L. had a marked limitation in health and physical well-being. (R. at 84.)

Reviewing the updated medical record in December, psychologist Bruce Goldsmith, Ph.D., and pediatrician, Anahi Ortiz, M.D., also assessed a marked limitation in the domain of health and physical well-being.  (R. at 94-95.)

## IV.    EDUCATIONAL RECORDS

In assessing K.L.'s special education services, her school implemented an Individualized Education Program (IEP) in December 2014.  (R. at 827-50.)  As part of that process, K.L. underwent speech and language skills evaluation, which showed her language skills were below average, her fine motor skills were below average, and her gross motor skills were normal.  (R. at 829.)  Cognitive testing revealed K.L. was unable to state her name, address or age.  She only knew the colors red, blue and green, could only identify 3 out of 8 body parts, could not follow simple directions or perform an understanding of number concepts.  Her speech was difficult to understand and she did not speak in sentences of at least 3 words.  She could not count to 10 or more objects without using fingers, could not name most letters of the alphabet, could not count from 1-20, did not know the days of the week in order and could not print at least 2 letters in her name.  The evaluation team concluded that K.L. had a deficit of more than 2 standard deviations from the mean.  (R. at 830.)  Based on these assessments, speech/language services and occupational therapy services were provided.  (R. at 836.)

7

On March 3, 2015, K.L.'s Intervention Specialist, Jennifer Secrest, completed a teacher evaluation.  (R. at 202-09.)  She stated K.L. was receiving special needs preschool all day for five days a week.  (*Id.*)  She found that K.L. had a serious detriment in recalling and applying previously learned material.  K.L. had a very serious detriment to academic success in expressing ideas in written form and in applying problem solving skills in learning areas, adding that she needs task broken down to small directions and details.  (R. at 204.)  Regarding communicative functioning, Ms. Secrest determined half to two-thirds of K.L.'s speech was understood on the first attempt whether topic of the conversation was known or unknown and this deficit had a serious adverse effect on educational performance and socializing with peers.  (R. at 205.)  Ms. Secrest believed that K.L.'s fine motor skills were a very serious detriment to academic success.  (R. at 206.)  Gross motor skills and coordination were a slight issue.  (*Id.*)  Regarding K.L.'s concentration, persistence, and pace, Ms. Secrest reported that she was easily distracted and often needed redirection, had serious problems with working independently, and some problems with maintaining pace and completing tasks on time.  (R. at 208.)

In October 2017, K.L.'s evaluation team prepared a Present Level of Functioning Addendum, in which they reported that when K.L. "does well on a task, her smile can light up a room, and she is so happy that she has done well.  She puts forth her very best effort on every task."  (R. at 1095.)  At that time, K.L. was working on below grade level in Reading, Writing, and Math.  She was working on Pre-K to K curriculum.  In Science and Social Studies, she was working at grade level but not meeting grade level standards.  K.L. required one-on-one instruction for all assignments.  Her teachers noted it was difficult for her to work independently.  K.L. was working on identifying alphabet letters and sounds. She knew 5 out of 11 letters in her name consistently.  She could identify 14 out of 26 lowercase letters.  K.L.

knew 9 out 10 numbers consistently, missing numbers 5 or 8. She was unable to complete a

task without one-on-one assistance. She did not participate in group activities. K.L. exhibited

positive behavior, worked without disrupting others, and adjusted to transitions or changes in

routine. They also noted a seizure plan of care was on file in the clinic. As far as language

update, K.L. could follow 2-step directions, but she needed to have picture cues to remind her of

the sequences needed to complete a task. She got confused about the sequence of steps when

she has to remember multi-step directions. She needs continued therapist prompts, to elicit

verbal prompts. K.L. received occupational therapy as a related service once a week for 30

minutes to address difficulties with fine motor strength/manipulation and perceptual motor

writing, coloring, and cutting tasks. K.L. was working on copying and fine motor skills and she

was improving in coloring. (R. at 1095.)

## V. THREE-STEP INQUIRY

The Commissioner uses a three-step process to determine if a child applicant is disabled

and entitled to benefits: (1) if the child is engaged in substantial gainful activity, the child is not

disabled; (2) if the child does not have a severe medically determinable impairment or

combination of impairments, the child is not disabled; and (3) if the child's impairment(s) do not

meet, medically equal, or functionally equal the listings, the child is not disabled. 20

C.F.R. § 416.924.

At the third step, an impairment functionally equals a listing if it results in "marked"

limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R.

§ 416.926a(a). The regulations identify six domains of functioning to be considered: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

9

with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health
and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A claimant has a "marked" limitation if the claimant's impairments seriously interfere
with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §
416.926(e)(2)(i). A "marked" limitation is more severe than "moder ate" and less severe than
"extreme." 20 C.F.R. § 416.926(e)(2)(i).   An impairment causes an "extreme" limitation when it
interferes very seriously with the claimant's ability to independently initiate, sustain, or complete
activities. 20 C.F.R. § 416.926(e)(3)(i).   In determining the effect of an impairment on the six
domains, the Commissioner considers information from medical sources, parents
and teachers, and consultative examiners. 20 C.F.R. § 416.926a(b)(3).

## VI.   THE ADMINISTRATIVE DECISION

On March 30, 2018, the ALJ issued his decision.   (R. at 949-66.)   The ALJ found that
K.L. was a preschooler on her application date and a school-age child on the date of the hearing.
(R. at 952.)   Further, the ALJ found that K.L. suffered from "severe" epilepsy and
developmental delay within the meaning of 20 C.F.R. §416.924(c).   (R. at 953.)   He concluded,
however, that K.L. does not have an impairment or combination of impairments that meets or
medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,
Appendix 1.   (*Id.*)   In the six domains used to determine a child's functional equivalence, the
ALJ found that K.L. has "less than marked" limitation in the domains of attending and
completing tasks, interacting and relating with others, moving about and manipulating objects,
caring for oneself, and health and physical well-being (R. at 958-66) and "marked" limitation in
the domain of acquiring and using information. (R. at 957-58.)   Consequently, the ALJ

concluded that K.L. was not disabled within the meaning of the Social Security Act.   (R. at 966.)

## VII.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.   *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

11

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII.   ANALYSIS

Plaintiff asserts four contentions of error:   (1) that the ALJ erred in determining that K.L. does not have marked limitations in the domain of health and well-being; (2) that the ALJ erred in determining that K.L. does not have marked limitations in the domain of attending and completing tasks; (3) that the ALJ erred by not considering the effect of K.L.'s marked limitation in acquiring and using information on the domain of attending and completing tasks; and (4) that the ALJ erred by not finding K.L. has an extreme limitation in acquiring and using information. (Doc. 13 at 5-9.)   The Court will address each in turn.

### A.   Health and Well Being

Plaintiff contends that the ALJ erred in determining that K.L. did not have a marked limitation in the domain of health and well-being.   A marked limitation requires that a child's impairment(s) interferes seriously with the "ability to independently initiate, sustain, or complete activities; their day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of   impairment(s) limit several activities. 20 C.F.R. § 416.926a.   A marked limitation is "more than moderate" but "less than extreme" and is" the equivalent of the functioning" expected to be found "on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." (*Id.*)

In the sixth domain of functioning, "health and physical well-being," a "marked" limitation can be determined if a child is "frequently ill because of an impairment(s) or has frequent exacerbations of impairment(s) that result in significant, documented symptoms or

signs." 20 C.F.R. § 416.926a.   Frequent is defined as episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. Further, a "marked" limitation can be determined if a child has episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity. (*Id.*)

The ALJ's conclusion that K.L. had less than a marked limitation in the domain of health and physical well-being is supported by substantial evidence.   For example, while recognizing that K.L.'s epilepsy was a severe impairment, the ALJ noted that her "seizure activity is generally controlled with medication" and that "[s]he was seizure free from April 2015 until November 2015, a few months after one of her medications was reduced." (R. at 955, 965.)    Further, the ALJ explained that while K.L. "did have a short-period of breakthrough seizures at the end of 2015 and in January 2015, once her medication was adjusted, she has had no significant episodes until November 2017."   (R. at 965.)   This conclusion is consistent with the record and supported by substantial evidence.   (R. at 1172, 1419-1420, 1425, 1747.)   Beyond this, the ALJ noted that physical examinations "have been unremarkable, for example with normal gait, symmetric reflexes and no motor or sensory deficit." (R. at 966.)   This, too, is supported by the record.   (R. at 1582.) Further, the ALJ reasonably relied on K.L.'s IEP (R. at 829) in noting that K.L. "was able to follow adult directions to stop when she is in danger, avoid getting too near a fire or hot stove, tell an adult if she is ill, feed herself, drink from a cup, ask for food when hungry, sit on the toilet without being held, and tell a parent or other adult when she needs to use the bathroom."   (R. at 966.)

13

Plaintiff does not argue that the ALJ mischaracterized any evidence in his discussion relating to this domain.   Plaintiff also concedes that K.L.'s seizures are controlled with medication.   (ECF No. 13, at p. 6.)   Instead, Plaintiff argues that the ALJ failed to discuss two additional pieces of information – (1) a diagnostic MRI evidencing K.L.'s brain malformation; and (2) a neuropsychological evaluation completed by Kelly Wolfe, an evaluation to which the ALJ assigned great weight in 2015.   According to Plaintiff, this additional information demonstrates issues with the development of K.L.'s left frontal lobe of a severity sufficient to demonstrate a marked limitation in this domain.   Plaintiff's arguments are not persuasive.

First, contrary to the Plaintiff's representation, the ALJ did acknowledge K.L.'s history involving a Chiari One malformation.   ("The claimant has a history of mild Chiari one malformation, scaphocephaly and complex partial epilepsy….   However, subsequent neurology treatment notes demonstrate that the claimant's seizures are well controlled with medication." R. at 955.)   Further, the ALJ discussed Kelly Wolfe's evaluation throughout his opinion, including in connection with this domain.   ("She is also noted to have some issues with fine motor abilities, though she had no difficulty with gross abilities (see e.g. Exhibits 5F/3...).")   (R. at 966.)   Moreover, even without these references, an ALJ's failure to discuss all the testimony and evidence presented to him relating to a specific domain does not mean the ALJ "failed to consider" that evidence.   *Woodard ex rel. R.W. v. Comm'r of Soc. Sec.,* No. 1:13CV116, 2014 WL 1271045, at *4 (S.D. Ohio Mar. 27, 2014) (citing *Loral Defense Sys.–Akron v. NLRB,* 200 F.3d 436, 453 (6th Cir.1999)).   "'An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Id.* (quoting *NLRB v. Beverly Enterprises–Massachusetts,* 174 F.3d 13, 26 (1st Cir.1999)).

14

Further, to the extent Plaintiff's argument rests on alleged deficits in K.L.'s functioning, as the ALJ noted, the health and physical well-being domain does not address typical development and functioning.   Rather, this domain addresses how a child's health and sense of physical well-being are impacted by recurrent illness, medication side effects, and the need for ongoing treatment.   20 C.F.R. 416.929a(1) and SSR 09-8p.   Consistent with the ALJ's discussion, some examples of expected difficulty in this area include (i) generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of any impairment(s); (ii) somatic complaints related to an impairment (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches or insomnia); (iii) limitations in physical functioning because of need for frequent treatment or therapy (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments); (iv) periodic exacerbations from an impairment( s) that interfere with physical functioning (e.g., pain crises from sickle cell anemia); or (v) medical fragility requiring intensive medical care to maintain level of health and physical well-being.   20 C.F.R. § 416.92a(1)(3) and SSR 09-8p.   As explained above, and as Plaintiff recognizes, the ALJ addressed the issue of K.L.'s epilepsy and the impact of K.L.'s medication on her epilepsy symptoms in concluding that she had a less than marked limitation in this domain.   (R. at 965.)

Finally, Plaintiff offers nothing but argument to suggest that K.L.'s cognitive weaknesses are a direct result of her brain malformation.   ("Five years after this evaluation K.L. still requires special services for her cognitive weaknesses, which one could clearly determine are a direct result of her evidenced brain malformation.") (ECF No. 13, at p.6.)   She fails to offer any evidence to support this supposition.   Further, Plaintiff's reliance of Kelly Wolfe's findings is

not convincing.   In her findings Ms. Wolfe specifically noted that they were only "likely to be attributable primarily to K.L.'s history of epilepsy and underlying cortical dysplasia, deficits in working memory, adaptive behavior and fin[e] motor skills implicate frontal lobe brain areas, consistent with the location of her cortical dysplasia."   (ECF No. 19, at 3.)   Beyond this, Plaintiff points to no evidence in the record demonstrating that K.L.'s Chiari one malformation is related to her cognitive impairments.

In sum, the ALJ's conclusion that K.L.'s limitation in this domain was less than marked is supported by substantial evidence.   Accordingly, this contention of error has no merit.

### B.   Attending and Completing Tasks

Plaintiff also contends that the ALJ erred in determining that K.L. did not have a marked limitation in the domain of attending and completing tasks.   This domain addresses how well the "child is able to focus and maintain attention, and how well she is able to begin, carry through, and finishes activities, including the mental pace at which she performs activities and the ease of changing activities."   (R. at 958-959.)   *See* 20 C.F.R. § 416.926a(h).   The ALJ assessed K.L.'s claim pursuant to two separate age groups: (a) preschool (age 3 to attainment of age 6) and (b) school-age (age 6 to attainment of age 12.)

Accordingly, the ALJ acknowledged:

> … a preschooler without an impairment should be able to pay attention when she is spoken to directly, sustain attention to her play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should also be able to focus long enough to do many more things independently, such as gathering clothes and dressing, feeding, or putting away toys. The child should usually be able to wait her turn and to change her activity when a caregiver or teacher says it is time to do something else. The child should be able to play contentedly and independently without constant supervision.

16

… a school-age child without an impairment should be able to focus her attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments. The child should be able to concentrate on details and not make careless mistakes in her work (beyond what would be expected in other children of the same age who do not have impairments). The child should be able to change activities or routines without distraction, and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by herself, and complete family chores. The child should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

(R. at 959); *see also* 20 C.F.R. § 416.926a(h)(2)(iii), (iv) and SSR 09-4p.

The ALJ's conclusion that K.L. did not have a marked limitation in this domain is supported by substantial evidence. The ALJ considered the evidence relating to this domain at some length as follows:

Ms. Secrest indicated that the claimant frequently needed directions repeated and one on one attention to complete many tasks. During the evaluation in 2013, it was noted the claimant had some difficulty maintaining attention during the evaluation and required breaks and the claimant's activity level was elevated (Exhibit 5F, *duplicated at 8F).* In May 2015, Ms. Lawson reported to the claimant's treating source that attention at preschool was becoming an issue and the claimant does not follow directions and gets side tracked now at home, though otherwise she was doing well (Exhibit 10F/45). During a neuropsychological re-evaluation in April 2016, the claimant's attention and activity level appeared to be within expectations for age and she responded well to encouragement and use of a sticker chart, though she frequently needed instructions clarified or repeated and benefitted from demonstration (Exhibit l0F/393). Her attention was below average on standardized testing and her performance was well below average on a measure of auditory attention; however, measures of auditory working memory and sustained attention had to be discontinued due to difficulty understanding instructions (Exhibit 10F/394). Behavior observations were notable for difficulty understanding instructions and need for frequent repetition. Of note, it was recommended that the claimant's difficulties with attention may improve with medication, though there is no indication a trial for this was pursued or warranted (see Exhibit l0F/397). Notes in an IEP indicate the claimant has difficulty working independently, though she works without disrupting others, and is able to adjust to transitions or changes in routine (Exhibit 11E/24, *duplicated at 10E).* When following two-step directions, she needed to have picture cues to remind her of the sequences needed to complete a task and she had some confusion about the sequence of steps when she has to remember multi-step directions, requiring prompting. She was noted to work well

> in a small group, was eager to learn and transitioned well throughout the day (Exhibit 11E/39). At the current hearing, Ms. Lawson indicated that the claimant could not sit through a movie from beginning to end. She also indicated that they try to read with the claimant at home, but the claimant will not read the book herself, unless Ms. Lawson tells her what the words are. She also described the claimant as forgetful and needs to be reminded how to do things, even things she has done before.

(R. at 959-960.)

As the above passage indicates, the ALJ clearly acknowledged the various issues K.L exhibited in this domain.   At the same time, however, he also reasonably relied on other evidence to support his conclusion that K.L.'s limitation in this domain was less than marked. For example, he cited to the 2016 neuropsychological re-evaluation that indicated K.L.'s "[a]ttention and activity level appeared to be within expectations for age."   (R. at 1515.) Further, the ALJ reasonably considered that K.L. "works without disrupting others and adjusts to transitions or changes in routine."   (R. at 1044.)   These are factors specifically relevant to this domain.  *See* SSR 09-4P, 2009 WL 396033, at *2, 5. ("We consider the child's ability to initiate and maintain attention…."   "Changes activities or routines without distracting self or others.") The ALJ's reliance on these factors is sufficient to meet his obligation here.   This is not to say that there is no evidence to support Plaintiff's claim of disability.   However, even if there is substantial evidence or a preponderance of the evidence to support a Plaintiff's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.* 469, 477 (6th Cir. 2003).

Moreover, Plaintiff does not assert that the ALJ mischaracterized any of the above evidence. In fact, to support her position, Plaintiff points to much of the same evidence: *e.g*., that K.L.'s attention was below average on standardized testing and her performance was well below

average on a measure of auditory retention; that she required picture cues to remind her of sequences needed to complete a task; and that she was forgetful and needed to be reminded how to do things.   (ECF No. 13, at pp. 7-8.)   Plaintiff cites to additional evidence as well, but that effort does not undermine a substantial evidence finding.   "A claimant does not establish a lack of substantial evidence by pointing to other evidence of record that supports her position." "*Greene ex rel. Greene v. Astrue*, No. 1:10-CV-0414, 2010 WL 5021033, at \*4 (N.D. Ohio Dec. 3, 2010).   Instead, Plaintiff's burden here is to "demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion."   *Id*.

At its essence, Plaintiff's argument here seems to be that the Court should weigh the evidence more favorably to K.L. The law in the Sixth Circuit is clear that a court cannot reweigh evidence considered by the ALJ.   Consequently, the Court declines to do so here.   *See Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013) (internal quotations and citations omitted) ("Here, the [plaintiff] asks us to reweigh the evidence and substitute our judgment for that of the ALJ.   We cannot do so.   Even if we would have taken a different view of the evidence were we the trier of facts, we must affirm the ALJ's reasonable interpretation.").

In sum, the ALJ's conclusion is supported by substantial evidence and Plaintiff has not demonstrated otherwise.   Accordingly, the second statement of error is without merit**.**

**C**. **Effect of Marked Limitation in Acquiring and Using Information on the Domain of Attending and Completing Tasks**

As far as the Court understands this statement of error, Plaintiff, relying on Social Security Ruling 09-1p, argues that K.L.'s inability to retain information - a limitation the ALJ found to be marked under the domain of acquiring and using information -would impact her

ability to attend and complete tasks. Accordingly, Plaintiff argues that the ALJ was required to properly analyze the evidence in relation to the "Whole Child" but he failed to do so.

As the ALJ acknowledged, the relevant rulings and regulations require that the limitations imposed by an impairment be considered in any affected domain. (R. at 954.) ("As provided in 20 CFR 416.926a(b) and (c) and explained in SSR 09-1p, the undersigned has evaluated the 'whole child' in making findings regarding functional equivalence.") *See* SSR 09–lp, 2009 WL 396031, at *2 (the "whole child" approach considers "all of the child's impairments singly and in combination-the interactive and cumulative effects of the impairments-because it starts with a consideration of actual functioning in all settings."); 20 C.F.R. § 416.926a(c) (providing for evaluation of "interactive and cumulative effects of an impairment or multiple impairments"). "The regulations recognize that an impairment 'may have effects in more than one domain' and that the limitations for an impairment must be evaluated 'in any affected domain(s).' 20 C.F.R. § 416.926a(c)." *Dorn v. Comm'r of Soc. Sec.,* No. 1:13-CV-197, 2015 WL 502142, at *5 (S.D. Ohio Feb. 5, 2015), *report and recommendation adopted*, No. 1:13CV197, 2015 WL 1020180 (S.D. Ohio Mar. 9, 2015).

The Undersigned finds no merit to Plaintiff's argument. "Just because a deficit leads to a finding of a 'marked' impairment in one area does not mean that the ALJ was required to find the same level of impairment in a different domain." *Smith v. Comm'r of Soc. Sec*., No. 1:14-CV-746, 2015 WL 9467684, at *9 (S.D. Ohio Dec. 2, 2015), *report and recommendation adopted*, No. 1:14CV746, 2015 WL 9460280 (S.D. Ohio Dec. 28, 2015). Further, the ALJ's proper application of the whole child approach is evident from the discussion of each domain set forth in his opinion. Accordingly, Plaintiff's third statement of error is without merit**.**

D. **Acquiring and Using Information**

Plaintiff contends that the ALJ erred in determining that K.L. had only a marked, but not an extreme, limitation in the domain of acquiring and using information.   An extreme limitation requires that a child's impairment(s) interferes very seriously with a child's ability to independently initiate, sustain, or complete activities.   An "extreme" limitation means a limitation that is "more than marked" and is the rating given to the worst limitations.   It does not necessarily mean a total lack or loss of ability to function but is the equivalent of the functioning on standardized testing with scores that are at least three standard deviations below the mean.   20 C.F.R. § 416.926a

The domain of acquiring and using information concerns a child's ability to acquire or learn information, and to use the information she has learned.   20 C.F.R. § 416.926a.   In reviewing this domain, the ALJ discussed the relevant standards to evaluate "how well a child is able to acquire or learn information, and how well a child uses the information she has learned."   (R. at 957.)   As the ALJ noted, the domain involves how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community.   *See* 20 C.F.R. § 416. 926a(g) and (SSR 09–3p).

In determining that K.L. had a marked, but less than extreme, limitation in this domain, the ALJ acknowledged K.L.'s history of issues at some length.   Of particular note, the ALJ cited to K.L.'s IEP from Columbus City Schools dated December 2014 (R. at 824-850) that "[w]hen comparing the claimant's performance in the areas of suspected disability to the performance of a typically developing child of the same age, her results indicate that a deficit of more than two standard deviations from the mean are present."   (R. at 958.)   As discussed above, this standard

21

deviation is consistent with a marked limitation and qualifies as substantial evidence to support the ALJ's conclusion here.

The regulation describing limitations in the acquiring and using information domain, 20 C.F.R. § 416.926a(g)(3), lists examples of limitations a child might have in this domain. The record shows that K.L. would appear to have some of those limitations, including recalling important things learned at school ("she can identify 14 of 26 lowercase letters" "she knows 9 out of 10 numbers consistently" R. at 1095.)    However, as the regulations themselves explain, just because a child has the limitations described, that does not mean the child has an extreme or even a marked impairment.    20 C.F.R. § 416.926a(g)(3) ("Also, the examples do not necessarily describe a 'marked' or 'extreme' limitation.").    Consequently, the fact that K.L.'s behavior may align with particular examples in the regulations does not mandate a result different from the ALJ's finding.

Again, Plaintiff does not assert that the ALJ mischaracterized any of the evidence on which he relied.    Rather, Plaintiff notes additional evidence which she explains supports a finding of an "extreme" limitation.    However, as discussed above, "a claimant does not establish a lack of substantial evidence by pointing to other evidence of record that supports her position." *Greene ex rel. Greene v. Astrue*, 2010 WL 5021033, at *4.    Plaintiff again seems to be asking the Court to weigh the evidence more favorably to K.L.    As previously explained, the Court simply cannot do so.    *Big Branch Res.*, 737 F.3d at 1074.    Even if there is substantial evidence or indeed a preponderance of the evidence to support a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

22

Because substantial evidence supports the ALJ's decision that K.L. has a marked limitation in this domain, Plaintiff's fourth statement of error is without merit**.**

## IX.    DISPOSITION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.   Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## X.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.   *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).   Even when timely objections are filed, appellate review of issues not raised in those objections is waived.   *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   July 30, 2020                                      /s/ *Elizabeth A. Preston Deavers*
                                                      Elizabeth A. Preston Deavers
                                                      Chief United States Magistrate Judge